UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TENNESSEE

MEMPHIS DIVISION

RECEIVED

OCT 2 9 2025

Wendy R Oliver, Clerk
U.S. District Court
W.D. OF TN, Memphis

REV. DR. GERALD KINER,

Pro Se Plaintiff,

individually and on behalf of all similarly situated MLGW ratepayers,

    Plaintiff,

v.

CITY OF MEMPHIS and MEMPHIS LIGHT, GAS & WATER DIVISION (MLGW),

and JOHN DOE DEFENDANTS 1–10 (to be revealed during discovery),

    Defendants.

Civil Action No. _____

CLASS ACTION COMPLAINT

FOR DAMAGES, INJUNCTIVE RELIEF, AND TREBLE DAMAGES UNDER 18 U.S.C. § 1964(c)

(Jury Trial Demanded)

**INTRODUCTION**

Memphis, once a proud city, now suffers levels of crime and corruption that rival those found in developing nations. In 2024, its crime rate exceeded that of Mexico City—a staggering reflection of systemic decay. FBI Director Kash Patel described Memphis as "the Homicide Capital of America."

Public negligence toward taxpayers' concerns has become so pervasive that President Donald J. Trump was forced to implement a federal crime-reduction initiative in response to the city's lawlessness and official indifference. The Department of Justice, led by U.S. Attorney General Pam Bondi, whose record underscores transparency and equal enforcement of the law,
launched the targeted crackdown in Memphis on September 15, 2025, and according to Fox News Digital (Exhibit H), the operation has produced extraordinary results: recovery of more than 70 missing children; 1,309 arrests, including 9 for homicide, 52 for sex offenses, 527 on outstanding warrants, 132 for firearm violations; and the arrest of more than 100 documented gang members.

Yet rather than confront the root causes of this civic collapse, Memphis City Councilman J.B. Smiley and others chose litigation over accountability—suing Tennessee Governor Bill Lee for deploying the National Guard to protect citizens. In doing so, they attacked those who acted to restore order while refusing to address the corruption and negligence within their own institutions that allowed crime to spiral out of control.

The same disregard for law and oversight infects the City's financial management. Exhibit I, as reported in the Shelby County Observer, reveals that despite federal regulation 2 C.F.R. § 200.430(h)(2) capping executive compensation on federally funded programs at $106.68 per hour, Mayor Paul Young and the Memphis City Council approved egregious contracts awarding TransPro CEO John Lewis $486 per hour, COO Steve Hamelin $205 per hour, and CFO Aaron Headly an astounding $1,000 per hour—$40,000 per week.

Such excess reflects not mere negligence but a pattern of deliberate disregard for federal law, fiscal prudence, and public trust—the same mindset that enabled the MLGW overbilling scheme to flourish unchecked. While citizens struggle to keep their lights on and choose between food and electricity, City-approved executives are paid $1,000 an hour with taxpayer funds.

That contradiction captures everything broken about Memphis governance: negligence is rewarded, honesty is punished, and the tax payers pay the price.

This case arises from that same culture of indifference, deception, and self-dealing. It concerns a public utility and a city government that turned negligence into policy—and then demanded that ratepayers shoulder the cost of their misconduct.

Imagine paying a mechanic to change your oil. He forgets to put the oil back in, destroys your engine, and then sends you the bill for a new one—claiming you must pay for his mistake. That is precisely what Memphis Light, Gas & Water ("MLGW") has done to the citizens of Memphis.

As reported in the University of Memphis' Institute for Public Service ( Exhibit G), in MLGW President Doug McGowen's own words. "The investment is long overdue. We've had a 'run-to-fail' mindset." That statement alone admits it: MLGW allowed its system to collapse through years of deliberate neglect. The failure was not accidental—it was institutional.

Then, when the predictable crisis arrived, MLGW forced ratepayers to foot the bill for the damage it caused, just as the negligent mechanic charges the customer to fix his own mistake. When questioned about the staggering cost of tree trimming, McGowen told the City Council, "The reason it's high is it hasn't been done in years. There is so much to haul off." That is not justification—it is an admission of prolonged dereliction of duty.

Despite these warnings, then–City Council Chairman Martavius Jones—despite his background as a financial advisor—dismissed all fiscal prudence, declaring the increase worth it ( Exhibit G). But Councilman Jones is not an engineer, not a procurement auditor, and not an energy economist. His statement was not based on data—it was based on deference, perhaps influenced by the same revolving-door politics that turned public service into private opportunity and the kind that seldom comes without expectation — or reward.

Exhibit G also shows Jones justified the 12 percent rate hike by reasoning that ratepayers often must throw away spoiled food at considerable cost following power outages. For the average Memphian, that means paying over $1,200 more over the

next decade to "save" $50 in spoiled milk—a defense so illogical it insults both mathematics and morality.

In truth, MLGW's own negligence—its admitted "run-to-fail mindset"—created the very outages that spoiled the milk in the first place. Thus, under Chairman Jones's reasoning, the citizens of Memphis are being billed not only for the spoiled food, but for the spoilers themselves. It is the civic equivalent of paying an arsonist to rebuild the house he burned—and tipping him for the inconvenience.

Because the numbers prove otherwise—figures obtained directly through public records requests and verified comparative audits ( Exhibit L) —the disparity is undeniable:

• Nashville pays approximately $6,641 per mile for tree trimming.

• Knoxville pays roughly $7,223 per mile.

• Memphis, under MLGW's self-admitted "run-to-fail" mismanagement, pays an astonishing $23,152 per mile.

These numbers, derived from official records lawfully obtained under the Tennessee Public Records Act, expose a pattern of inflated costs and systemic fiscal negligence that cannot be explained by geography, labor, or logistics—but only by corruption, collusion, or conscious disregard for the public trust.

It is overbilling on a scale that shocks the conscience—a direct consequence of negligence being rebranded as investment.

In Memphis, the faces change but the pattern does not—and when the same official can mismanage hundreds of millions across multiple city divisions without consequence, corruption stops being coincidence and becomes policy. Exhibit J further demonstrates that this misconduct is not confined to MLGW but reflects a continuing pattern of racketeering activity within the City of Memphis itself. Joe B. Kent's investigative report documents how the Riverfront Steering Committee ("RSC"), created under former Chief Operating Officer Doug McGowen—now MLGW President—oversaw more than $100 million in public projects without holding a single public meeting, publishing minutes, or issuing financial reports. Under McGowen's direction, contractors such as the Memphis River Parks Partnership (MRPP) were paid in full for incomplete projects, including the Cossitt Library and Cobblestone Landing renovations. The City disbursed 96 percent of a $9.4 million Cobblestones contract while the site remains in total disarray til this day. It is no coincidence that the same official who authorized $228 million in inflated MLGW spending also presided over more than $100 million in unfinished city contracts—each enabled by the same City Council that rewarded failure and silenced oversight.

Exhibit K, the 2024 PwC Forensic Audit of the Memphis Area Transit Authority (MATA), as identified by investigative reporter Joe B. Kent adds the final pillar to this pattern by exposing systemic procurement fraud and collusion between City Council members and vendors. The $600,000 audit revealed that MATA regularly paid for goods and services without independent cost estimates or supporting documentation; vendors were allowed to dictate what the agency purchased; and federal grant funds were misused for non-existent projects, including a trolley program that had already been suspended.

The PwC audit's documented misuse of federal transit grants triggers both FTA administrative and DOJ/FBI criminal jurisdiction, firmly establishing the federal nexus for this RICO action. The same Council members—Martavius Jones, J.B. Smiley, and others—were aware of these deficiencies as early as 2019 but took no action, proving willful blindness and continuity of enterprise.

Together, Exhibits A–O connect the four pillars of corruption in Memphis:

1. MLGW – Utility overbilling and ratepayer exploitation;

2. Riverfront Steering Committee – Ghost oversight and phony contracts;

3. MATA – Procurement fraud and federal grant misuse; and

4. More for Memphis – A coordinated city–county scheme in which PAC-funded officials enacted a fraudulent $100 million ordinance to funnel public money to political donors and suppress dissent through official oppression and manipulated legislative votes.

These are not isolated incidents but a coordinated system of racketeering activity carried out through City-controlled enterprises to defraud taxpayers, divert federal funds, and enrich favored vendors and political allies. The pattern meets every element of 18 U.S.C. § 1961 et seq.—continuity, enterprise, predicate acts, and federal jurisdiction.

As the PwC audit, public records, and whistleblower evidence collectively demonstrate, the corruption infecting Memphis's governance is not isolated—it is institutionalized. The same officials who oversaw MLGW's inflated utility contracts and MATA's fraudulent grant expenditures are enmeshed in a wider network of political and financial collusion that extends deep into Shelby County Government itself.

Building on this continuum, recent investigative reporting by the Shelby County Observer, titled "How Government Gangsters Corrupted Memphis and Shelby County's New Era of Government (Part I)" (Exhibit M), exposes how the very individuals entrusted with reforming city governance instead deepened its dysfunction. The article reveals that Memphis Mayor Paul Young appointed indicted Shelby County Commissioner Edmund Ford Jr.—then under active FBI investigation and federal indictment for grant theft—to a taxpayer-funded position as Senior Financial Literacy Coordinator, paying him $82,766.32 per year, even as Ford continued to wield influence over multimillion-dollar discretionary grant programs in his capacity as a sitting County Commissioner.

Ford Jr., a former Memphis City Councilman, previously participated in the approval and oversight of several projects now under federal and forensic scrutiny, including MATA's federally audited expenditures, the Cobblestone Landing renovation, and initiatives overseen by MLGW President Doug McGowen, with whom Ford has maintained longstanding political and professional ties. This overlapping network of influence demonstrates not merely negligence but a coordinated enterprise structured to retain financial control across multiple public agencies and quasi-governmental boards.

The Observer's findings further reveal that Ford leveraged his County position to shape the "More for Memphis" joint ordinance—an alleged $100 million scheme designed to funnel taxpayer funds to political donors and favored organizations under the guise of community investment. Together, these revelations reinforce Plaintiff's allegations that the City of Memphis and Shelby County Government operate as a single, continuing RICO enterprise, converting public authority into private profit through bid-rigging, collusion, and the suppression of public-records transparency—all at the expense of Memphis and Shelby County taxpayers.

Further compounding the corruption detailed above, Exhibit N — "$8,300 Returned: Shelby County Commissioner Brandon Morrison Clears Name and Distances Herself Amid Growing Tennessee Prosperity PAC Donation and More for Memphis Scandal" — exposes the financial wiring behind the More for Memphis fraud.  This investigative report documents that Tennessee Prosperity PAC funneled targeted campaign contributions to City Council and County Commission members who later voted for or promoted the More for Memphis joint ordinance—an ordinance that falsely claimed to have $100 million in secured taxpayer funding, when, in truth, no such funds had been secured.

According to the Shelby County Observer, while Commissioner Brandon Morrison prudently refunded her $8,300 PAC contribution months before the scandal surfaced, her colleagues did not.  Records reveal that the following Shelby County Commissioners accepted and retained Tennessee Prosperity PAC funds:

- Commissioner Mickell Lowery Whaley – $8,300

- Commissioner Edmund Ford Jr. – $8,300

- Commissioner Mickell Mills – $8,300

- Commissioner Shante Avant – $8,300

- Commissioner Erika Sugarmon – $4,000

Parallel PAC donations were disbursed to Memphis City Council members, including:

- Councilman J.B. Smiley Jr. – $2,500

- Councilwoman Michalyn Easter-Thomas – $2,500

- Councilwoman Pearl Eva Green – $5,000

- Councilman Chase Spinosa – $2,500

- Councilwoman Patrice Robinson White – $2,500

- Councilman Worth Morgan Carlisle – $2,500

- Councilman Ford Canale – $2,500

Many of these same officials participated in or presided over meetings and votes
advancing the More for Memphis ordinance while simultaneously suppressing public
scrutiny.  During these meetings, public speaking time was reduced from three minutes
to one, dissenters were cut off mid-statement, and speakers were verbally
threatened—conduct constituting official oppression under T.C.A. § 39-16-403.

These transactions and acts together demonstrate a coordinated quid-pro-quo scheme
linking PAC donations to legislative outcomes—a textbook pattern of racketeering
activity under 18 U.S.C. §§ 1961(1), 1962(c) and honest-services fraud under 18 U.S.C.
§§ 1341, 1343, and 1346.  The More for Memphis operation thus represents the
financial and political epicenter of the larger RICO enterprise, connecting the Mayor's
Office, the City Council, and the County Commission in a single, continuous conspiracy
to convert public authority into private profit while suppressing dissent and obstructing
access to the truth.

Further corroborating this pattern, Exhibit O, titled "Money Trail Exposed: Commissioner
Thornton Blows the Whistle on PAC Ties to City and County Officials in the $100 Million
More for Memphis Scandal," reveals that Tennessee Prosperity PAC—the political arm
of Seeding Success—funneled campaign donations to both Memphis City Council and
Shelby County Commission members who later voted to enact the fraudulent More for
Memphis ordinance the brian child of Seeding Success. The article documents

Commissioner Brittany Thornton's on-record admission that "many of us on both the city
and county side are funded by the PAC," identifies the exact amounts each official
received, and exposes how Councilman Ford Canale's illegal vote change and Chair
Easter-Thomas's directive to "tell Shelby County to get it done this week" confirmed
coordinated legislative manipulation—proving that the More for Memphis ordinance was
not legislation at all, but the product of a prearranged criminal enterprise.

For these reasons. this lawsuit seeks to convert outrage into accountability. What began
as negligence disguised as necessity will now face the full scrutiny of federal law and
the justice of an informed jury.

JURISDICTION AND VENUE

1. Jurisdiction lies under 28 U.S.C. §§ 1331, 1343, and 1964(c).

2. Venue is proper in this District under 28 U.S.C. § 1391(b) because all relevant
   acts occurred within Shelby County, Tennessee.

PARTIES

3. Accepting significant personal and professional risk to exposure while acting in
   the public interest, Plaintiff Rev. Dr. Gerald Kiner is a Memphis resident, taxpayer,
   and ratepayer and early protester of the $228 million tree-trimming contract,
   similarly injured by Defendants' unlawful actions.

4. Defendant City of Memphis owns and operates MLGW.

5. Defendant MLGW is a municipal utility that receives federal and state funding
   exceeding $10 million per year.

6. John Doe Defendants 1–10 are individuals and/or entities whose identities will be
   revealed in discovery and who participated in or benefitted from the enterprise.

FACTUAL BACKGROUND

A. The "Run-to-Fail" Mismanagement Model

7. On December 6, 2023, the University of Memphis Institute for Public Service
Reporting published "Trimming Trees: MLGW's Ambitious Plan to Curb Power Outages"
(Exhibit G)  Therein, MLGW CEO Doug McGowen admitted that the utility has operated
under a "run-to-fail mindset," acknowledging decades of deferred maintenance and a
lack of fiscal discipline.

8. McGowen stated: "What we're suffering from reliability-wise is a lack of investment over time, over decades and decades of time."

9. He further justified abnormally high tree-trimming costs by admitting, "The reason it's high is it hasn't been done in years. There is so much to haul off."

10. Such statements show Defendants' knowledge of inflated costs and their reckless disregard for fiscal prudence, satisfying the scienter element of fraud.

B. The 12 Percent Rate Hike and Inflated Vegetation Expenditures

11. On December 5, 2023, the Memphis City Council approved a 12 percent rate increase (Exhibit B) explicitly linked to a $228 million tree-trimming initiative.

12. Evidence obtained through public-records requests and comparative audits (Exhibits C,E, F, and L) establishes that MLGW paid $23,152 per mile for vegetation management while NES and KUB paid $6,641 and $7,223 per mile respectively—a markup of over 300 percent.

13. These figures demonstrate a pattern of overbilling and self-dealing, as contract amounts were knowingly inflated without competitive verification.

C. Enterprise Structure and Pattern of Conduct

14. The enterprise consists of (1) City officials who approved the contracts and rate increases; (2) MLGW executives who authorized and transmitted inflated payments; and (3) contractors and consultants who received those funds.

15. The enterprise's object was to divert public money under false pretenses, misusing federal utility funds and ratepayer revenue for unjust enrichment.

D. Public Criticism and Notice of Fraud

16. The 2023 University of Memphis report recorded that critic(s) warned MLGW was "overpaying for tree trimming." (Exhibit G).

17. Despite these warnings, City Council Chair Martavius Jones declared the increase worth it, illustrating willful blindness to clear evidence of overbilling.

E. Injury to Plaintiff and Class

18. As a direct result of Defendants' conduct, ratepayers began paying higher bills in January 2024 without commensurate service benefit.

19. Plaintiff and the class have suffered monetary injury through unlawful overcharges and misuse of public funds.

**F. Parallel Patterns of Mismanagement and Fraud in City Contracting (Exhibit J)**

**20.** Exhibit J, an investigative report published by Memphis civic watchdog Joe B. Kent details how former Chief Operating Officer Doug McGowen—now MLGW President—and the Riverfront Steering Committee (RSC) oversaw more than $100 million in public projects without holding a single public meeting, publishing minutes, or issuing reports which supports Pattern of Conduct as it is well known Courts look for

"pattern" under RICO § 1961(5), this shows repeated acts by the same decision-makers across projects

21. Under McGowen's direction, the City paid contractors and the Memphis River Parks Partnership in full for projects such as the Cossitt Library renovation and Cobblestone Landing restoration, despite the work being incomplete or defective

22. This pattern of secrecy, overpayment, and lack of accountability mirrors the operational failures and overbilling schemes described herein with MLGW demonstrating that such misconduct was not isolated but institutional and recurring across Memphis government departments

23. The evidence presented in Exhibit J corroborates Plaintiffs' allegations of a continuing enterprise pattern of fraud, mismanagement, and concealment, in violation of federal statutes and fiduciary duties owed to the citizens and ratepayers of Memphis

## G. The MATA Forensic Audit and the Continuation of the Racketeering Pattern (Exhibit K)

24. Exhibit K, the 2024 PwC Forensic Audit of the Memphis Area Transit Authority (MATA), provides documentary evidence of the same racketeering template used throughout City-controlled entities

25. The audit confirms that vendors dictated procurement terms, invoices preceded purchase orders by months, and payments were made from federal grant funds for unimplemented projects—conduct constituting fraud and theft under 18 U.S.C. §§ 666 and 1001.

26. The audit further shows that the Memphis City Council, despite multiple warnings since 2019 and repeated findings in consecutive FTA Triennial Reviews, willfully refused to act. This establishes the element of continuity under RICO § 1961(5), the same decision-makers ignored procurement law violations year after year.

27. Specific findings include:

    a. $2.2 million TransPro engagement delivering no tangible results where contractors are paid as much as $1000 per hour.

    b. Vendors issuing invoices before purchase orders, with falsified Independent Cost Estimates ("ICEs").

    c. Pre-paid ten-year leases and luxury Grizzlies suite expenditures totaling millions with no public benefit.

    d. Federal grant-funded trolley vehicles purchased for a suspended service.

exposing the City to federal clawback.

28. These findings demonstrate that the City of Memphis enterprise has institutionalized fraud and concealment across departments—Riverfront (MRPP, RSC), MATA, and MLGW—each operating through opaque boards, inflated contracts, and nonexistent oversight.

29. The PwC audit, corroborated by Exhibits A-0 forms the third pillar of Plaintiff's RICO pattern, proving that the same actors—Mayor Paul Young, former COO Doug McGowen, Council Chair Martavius Jones, and others—used their offices to perpetuate a continuing scheme to defraud federal programs and Memphis taxpayers.

## COUNTS

## COUNT I – WIRE FRAUD (18 U.S.C. § 1343)

Defendants devised and executed a scheme to defraud the Plaintiff and the public by electronically transmitting false invoices, expenditure data, and financial reports through email, MLGW dashboards, and wire-based payment systems. MLGW's "Electric Reliability and Resilience Road Map" and vegetation-management dashboards contained materially false representations of costs and completion metrics transmitted

electronically to the City Council, state regulators, and the public. Each electronic transmission constitutes a separate predicate act under 18 U.S.C. § 1961(1) supporting treble damages under § 1964(c).

COUNT II – MAIL FRAUD (18 U.S.C. § 1341)

Defendants used the United States Postal Service to mail contracts, checks, and compliance certifications connected to the overbilling scheme. Each mailing furthered the enterprise's objective of extracting inflated payments from ratepayers and taxpayers.

COUNT III – FALSE CLAIMS ACT VIOLATIONS (31 U.S.C. §§ 3729–3733)

Defendants knowingly presented or caused to be presented false claims for payment to a government-funded utility that receives substantial federal infrastructure, ARPA, and DOE assistance. MLGW's acceptance of inflated contractor invoices constitutes a "false claim" within the meaning of § 3729(a)(1)(A). Remedy: treble damages, civil penalties per claim, and restitution to the public treasury.

COUNT IV – THEFT OR BRIBERY CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS (18 U.S.C. § 666)

City and MLGW officials misapplied property valued in excess of $5,000, directing contracts to favored vendors and authorizing excessive payments while MLGW received more than $10,000 annually in federal funds. Discovery will reveal any vendor that contributed politically or maintained personal relationships with decision-makers, constituting a corrupt quid pro quo.

COUNT V – DEPRIVATION OF PROPERTY UNDER COLOR OF STATE LAW (42 U.S.C. § 1983)

By approving and enforcing a fraudulent 12% rate increase and diverting funds through mismanagement, Defendants deprived Plaintiff of property (money) without due process of law. The deprivation occurred under color of state authority, satisfying Monroe v. Pape, 365 U.S. 167 (1961).

COUNT VI – CONSPIRACY TO DEFRAUD THE UNITED STATES (18 U.S.C. § 371)

Officials and contractors combined to obstruct lawful governmental functions—specifically, fair procurement oversight and honest expenditure of federally influenced utility funds.

COUNT VII – SHERMAN ANTITRUST ACT (BID-RIGGING / PRICE-FIXING) (15 U.S.C. § 1)

Defendants engaged in concerted action to restrain trade by allocating or fixing prices for tree-trimming contracts. The uniform escalation of per-mile costs—over 300% higher than Nashville or Knoxville—indicates collusive pricing.

COUNT VIII – FALSE STATEMENTS TO FEDERAL AUTHORITIES (18 U.S.C. § 1001)

MLGW and City officials knowingly submitted falsified cost reports to federal or state entities charged with infrastructure oversight, thereby concealing overbilling. Each false certification of compliance constitutes a separate offense and RICO predicate act.

COUNT IX – MONEY LAUNDERING (18 U.S.C. § 1956)

Funds obtained through inflated contracts were transferred through layered vendor accounts and sub-contracts to conceal their origin and ownership.

COUNT X – HONEST SERVICES FRAUD (18 U.S.C. § 1346)

Public officials owed ratepayers and taxpayers a duty of honest services. By approving padded contracts and suppressing cost comparisons, they deprived citizens of that right.

COUNT XI – FRAUDULENT MISREPRESENTATION AND CONCEALMENT (Common Law)

Defendants made material misstatements regarding project costs and failed to disclose internal audits demonstrating overbilling.

COUNT XII – UNJUST ENRICHMENT

Defendants retained ill-gotten gains derived from inflated ratepayer charges without lawful justification.

COUNT XIII – BREACH OF FIDUCIARY DUTY / PUBLIC TRUST

As stewards of a publicly owned utility, City and MLGW officials owed fiduciary duties of loyalty, care, and transparency. Their knowing approval of wasteful expenditures and concealment of benchmarking data violated these duties.

COUNT XIV – GROSS MISMANAGEMENT AND NEGLIGENCE PER SE

Defendants' failure to maintain a reasonable maintenance cycle ("run-to-fail mindset")

constitutes negligence per se under Tennessee public-utility standards and federal grant

conditions.

COUNT XV – CIVIL CONSPIRACY

Defendants and unknown co-conspirators combined for the unlawful purpose of inflating

costs, obtaining higher rates, and distributing proceeds.

COUNT XVI – CIVIL RICO (18 U.S.C. §§ 1961–1964)

The City of Memphis and MLGW, acting through officials and contractors, formed an

association-in-fact enterprise. Predicate acts include mail fraud, wire fraud,

honest-services fraud, false statements, and misapplication of funds, continuing from at

least 2020 through the present. Remedy: treble damages, equitable relief, and

appointment of an independent fiscal monitor under § 1964(a).

**COUNT XVII – MISUSE OF FEDERAL TRANSIT FUNDS AND FALSE STATEMENTS
TO FEDERAL AUTHORITIES**

(18 U.S.C. §§ 1001, 666; 49 U.S.C. § 5331)

Defendants, acting under color of state authority, knowingly misused and misapplied

funds derived from Federal Transit Administration (FTA) and U.S. Department of

Transportation grants, including those governed by 49 U.S.C. § 5331 and federal procurement standards under 2 C.F.R. Part 200.

Factual Basis:

The PwC audit ( Exhibit K) revealed that funds were expended on projects not in use, including a suspended trolley program and undeployed bus shelters, triggering both FTA administrative and DOJ/FBI criminal jurisdiction. The same Council members—Martavius Jones, J.B. Smiley, and others—had prior notice of these deficiencies yet took no remedial action, demonstrating willful blindness and continuity of the enterprise.

Elements Satisfied:

1. Defendants knowingly caused false statements and certifications to be made to federal agencies regarding the use of transit funds;

2. Defendants misapplied property exceeding $5,000 while receiving more than $10,000 annually in federal assistance;

3. Conduct constitutes a predicate act under 18 U.S.C. § 1961(1) supporting this civil RICO action.

Remedy:

Declaratory and injunctive relief, treble damages, and referral to the Department of

Justice for potential prosecution under federal fraud and corruption statutes.

## COUNT XVIII – HONEST SERVICES FRAUD

(18 U.S.C. §§ 1341, 1343, and 1346 – Pattern of Quid-Pro-Quo Influence Through

PAC-Funded Legislative Acts)

### 1. Incorporation by Reference

Plaintiff incorporates by reference all preceding paragraphs and Exhibits A through O,

as if fully restated herein, documenting the Tennessee Prosperity PAC donation

scheme, the More for Memphis joint-ordinance fraud, and related conflicts of interest

within the City of Memphis and Shelby County Government.

### 2. Statutory Basis and Elements

Under 18 U.S.C. §§ 1341, 1343, and 1346, it is unlawful to devise or intend to devise a

scheme or artifice to defraud the public of the intangible right of honest services by

means of false pretenses, misrepresentations, or concealment of material facts.  Public

officials who accept money, gifts, or campaign contributions in exchange for the

performance of official acts deprive their constituents of honest services within the

meaning of Skilling v. United States, 561 U.S. 358 (2010).

### 3. Factual Predicate (Exhibits M & N)

(a) As documented in Exhibit M, Mayor Paul Young appointed indicted Commissioner
Edmund Ford Jr. — then under active FBI investigation for grant-fund manipulation — to
a salaried city position while Ford simultaneously exercised influence over
multimillion-dollar discretionary grants and co-authored the More for Memphis joint
ordinance.

(b) As documented in Exhibit N, Tennessee Prosperity PAC made targeted campaign
contributions to Shelby County Commissioners Whaley ($8,300), Ford Jr. ($8,300), Mills
($8,300), Avant ($8,300), and Sugarmon ($4,000), as well as to Memphis City Council
members Smiley Jr. ($2,500), Easter-Thomas ($2.500), Green ($5,000), Spinosa
($2,500), White ($2,500), Carlisle ($2,500), and Canale ($2,500).

(c) These contributions were followed by coordinated legislative actions to approve or
advance the More for Memphis ordinance — an ordinance falsely claiming to have $100
million in secured funding — and by deliberate acts of official oppression to silence
public opposition, including reducing citizen speaking time from three minutes to one
minute and cutting off dissenters mid-statement.

**4. Scheme and Intent**

Defendants devised and participated in a continuing scheme to:

(a) use PAC donations as a mechanism of influence and control over legislative
outcomes;

(b) deprive the citizens and ratepayers of Memphis and Shelby County of the intangible
right to honest services of their elected representatives; and

(c) conceal these conflicts through coordinated misuse of public-records procedures and intimidation of dissenters.

### 5. Nexus to Federal Jurisdiction

The scheme utilized interstate wires and mails in furtherance of the PAC's fundraising, donation disbursement, and communication with city and county officials. Because the PAC operated across state lines, accepted electronic contributions, and transmitted reports via interstate data systems, jurisdiction under 18 U.S.C. §§ 1341 and 1343 is proper.

### 6. Pattern and Continuity

This conduct constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and forms a predicate act under 18 U.S.C. § 1961(1)(B), demonstrating continuity with the broader RICO enterprise described in Counts I through XVI. The PAC donation scheme was neither isolated nor spontaneous—it was part of an established political pay-to-play network spanning multiple agencies and election cycles.

## COUNT XIX – FRAUDULENT CERTIFICATION OF LEGISLATIVE RECORDS AND OFFICIAL MISCONDUCT

(T.C.A. §§ 39-16-402, 39-16-403; 42 U.S.C. § 1983 – Deprivation of Rights Under Color of Law)

### 1. Incorporation by Reference

Plaintiff incorporates by reference all preceding paragraphs and Exhibits A through O,
including Exhibit O—"Money Trail Exposed: Commissioner Thornton Blows the Whistle
on PAC Ties to City and County Officials in the $100 Million More for Memphis
Scandal"—as though fully set forth herein.

**2. Factual Basis and Pattern of Conduct**

(a) As documented in Exhibit O, Shelby County Commissioner Brittany Thornton
publicly admitted during the December 16, 2024 Commission Meeting that she—and
"many of us on both the city and county side"—were funded by Tennessee Prosperity
PAC ("Tennessee Prospers"), the political arm of Seeding Success. Her disclosure
provided direct evidence of PAC coordination in local legislation.

(b) The same report details that Tennessee Prosperity PAC financially supported both
Shelby County Commissioners and Memphis City Council members who later advanced
and passed the fraudulent "More for Memphis" ordinance. The official amounts received
include:

• Commissioners Whaley ($8,300), Wright ($8,300), Ford Jr. ($8,300). Morrison
($8,300), Mills ($8,300), Avant ($8,300), Sugarmon ($4,000);

• City Council members Smiley Jr. ($2,500), Easter-Thomas ($2,500), Green ($5,000).
Spinosa ($2,500), White ($2,500), Carlisle ($2,500), Canale ($2,500).

(c) During the ordinance's first reading on November 12, 2024, Council Chair Michalyn
Easter-Thomas announced that all members would be added as co-sponsors "without

objection" and directed staff to "tell Shelby County to go ahead and get it done this week," demonstrating prearranged coordination and a foregone outcome.

(d) At the ordinance's second reading, Councilman Ford Canale illegally altered his abstention vote to "yes," thereby reversing the measure's failure to pass. Such post-vote alteration violates the Memphis City Council Rules of Procedure and renders the vote fraudulent on its face.

(e) These acts collectively constitute a fraudulent certification of legislative records and a pattern of official misconduct executed under color of state law to advance a financially tainted ordinance benefiting PAC donors and political allies.

### 3. Legal Violations

1. Official Misconduct – T.C.A. § 39-16-402: Each official used public office for personal or financial gain by voting on and advancing legislation in which they had a direct financial interest through PAC contributions.

2. Official Oppression – T.C.A. § 39-16-403: Council and Commission leadership restricted public comment times, interrupted speakers, and suppressed dissent to prevent exposure of PAC influence and procurement fraud.

3. Deprivation of Rights Under Color of Law – 42 U.S.C. § 1983: By manipulating procedures and concealing PAC influence, Defendants deprived Plaintiff and citizens of due process, equal protection, and the intangible right to honest

representation in municipal governance.

### 4. Scheme and Intent

Defendants knowingly participated in a scheme to validate a false legislative record and misrepresent the "More for Memphis" ordinance as lawfully enacted and financially secured. Their intent was to divert public funds to PAC-connected entities while obstructing scrutiny through procedural manipulation and intimidation of citizens and journalists.

### 5. Federal Nexus and Continuity

The scheme was executed through interstate wires and emails disseminating the ordinance agenda, press releases, and PAC solicitations across state lines. This conduct forms a predicate act under 18 U.S.C. § 1961(1)(B) and demonstrates continuity with the broader RICO enterprise alleged in Counts XVI and XVIII.

### 6. Injury to Plaintiff and the Public

Plaintiff and Memphis ratepayers and taxpayers suffered direct economic harm and loss of public trust as a result of fraudulent ordinance passage and diversion of taxpayer funds. The fraudulent certification perpetuated the pattern of racketeering that has enabled misuse of more than $100 million in allegedly "secured" funds.

## PRAYER FOR RELIEF AND EQUITABLE REMEDIES

For the reasons set forth herein, and pursuant to 18 U.S.C. § 1964(a), 31 U.S.C. §§ 3729–3733, and 42 U.S.C. § 1983. Plaintiff respectfully moves this Honorable Court to grant the following relief in the interest of justice, equity, and the public welfare:

1. Declaratory Relief – Declare that Defendants' actions constitute unlawful conduct under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the False Claims Act ("FCA"), and the Civil Rights Act (42 U.S.C. § 1983), violating the constitutional and statutory rights of ratepayers and citizens of Memphis. Tennessee.

2. Damages – Award compensatory, treble, and punitive damages totaling not less than One Billion Dollars ($1,000,000,000) to Plaintiff and all similarly situated ratepayers, consistent with 18 U.S.C. § 1964(c) and 31 U.S.C. § 3729(a)(1). This figure reflects the scale of economic injury, the systemic nature of Defendants' misconduct, and the punitive necessity of deterring future abuses of public trust. The precise amount shall be further determined at trial.

3. Restitution and Disgorgement – Order restitution of all unlawfully obtained funds and the disgorgement of profits derived from overbilling. self-dealing, and bid-rigging practices.

4. Injunctive Relief – Enjoin Defendants from implementing or collecting any future rate increases until completion of a full, independent forensic audit of all utility

expenditures, contracts, and vendor relationships.

5. Appointment of Independent Fiscal Monitor – Appoint a Special Master or Fiscal
Monitor, pursuant to 18 U.S.C. § 1964(a), to oversee MLGW's financial
operations, contract compliance, and procurement integrity for a minimum of five
years.

6. Establishment of Ratepayer Restorative Utility Fund – Due to Daughters of Zion's
proven experience assisting struggling ratepayers with utility-bill relief—including
through contracts with Shelby County Government, grants awarded by the United
Way, and its direct involvement under the leadership of Dr. Gerald Kiner—the
organization is uniquely qualified to serve as fiduciary administrator of the
Ratepayer Relief and Restorative Utility Fund and is the only entity with the
moral, operational, and historical legitimacy to do so. Unlike other organizations
that may later claim similar capacity, Daughters of Zion has already faced
retaliation that has led to several federal lawsuits and now accepts additional
significant organizational risk to expose and document this scheme long before
any public acknowledgment existed. Its courage and independent record of
advocacy establish an unparalleled level of credibility and public trust—qualities
that Rule 23(e) expressly favors when determining fair, adequate, and ethical
administration of restitution funds. This unique record confers DOZ's priority
status as the most qualified, independent, and ethically sound administrator of
any court-ordered restitution or relief fund. This is often what judges rely on to

reject opportunistic third parties who jump in after-the-fact to grab control of

settlement funds, ensuring that justice remains in the hands of those who first

pursued it in good faith.

Accordingly, the appointment of DOZ as fund administrator is legally and ethically

justified under Fed. R. Civ. P. 23(e) and consistent with equitable doctrines

governing restitution and constructive-trust remedies. The fund shall:

  • Provide direct utility-bill assistance, credits, or refunds to ratepayers harmed by
the overbilling scheme;

  • Fund community-impact initiatives such as weatherizing senior ratepayers'
homes and replacing inefficient appliances to reduce future utility costs; and

  • Report to the public through annual independent audits to ensure transparency
and compliance.

7.  Class Action Certification – Certify this case as a Rule 23(a) and (b)(3) class

    action on behalf of all affected ratepayers, and appoint Plaintiff Rev. Dr. Gerald

    Kiner as Class Representative to ensure vigorous and equitable protection of all

    class members' interests.

8.  Whistleblower Incentive Award – Accepting significant personal and professional

    risk to exposure while acting in the public interest, grant a Whistleblower

Incentive Award recognizing the extraordinary efforts of Plaintiff Rev. Dr. Gerald

Kiner, whose independent investigations, documentation, and public advocacy

were instrumental in exposing the fraud and protecting taxpayers. pursuant to 31

U.S.C. § 3730(d) and 18 U.S.C. § 1964(a).

9. **Emergency Temporary Restraining Order (TRO)** Emergency Temporary

Restraining Order (TRO) Pursuant to Fed. R. Civ. P. 65(b), Plaintiff respectfully

requests that this Court issue an ex parte Temporary Restraining Order

immediately enjoining the City of Memphis. its Mayor, and its City Council from

(a) issuing, approving, or disbursing any discretionary or grant-based public

funds; and (b) implementing or approving any further MLGW rate increases.

pending full judicial review and the appointment of a Court-supervised Special

Master. This emergency relief is necessary to prevent immediate and irreparable

injury to Memphis ratepayers and taxpayers by halting further dissipation of

public funds, grant allocations. and ratepayer revenues that are central to the

alleged RICO enterprise. Plaintiff further requests that all pending and future

discretionary grant allocations be transferred to the custody and control of the

Court-appointed Fiscal Monitor or Special Master to ensure transparency,

impartial administration. and preservation of the status quo during litigation. The

harm to the public if such relief is not granted far outweighs any administrative

inconvenience to Defendants and is squarely within the Court's equitable powers

under 18 U.S.C. § 1964(a) and Rule 65(b).

10. **Federal Referral and Oversight Enforcement** – Direct the Clerk of Court to transmit certified copies of this Complaint, along with Exhibits I–K, to the U.S. Department of Justice, Office of the U.S. Attorney General, and the Federal Transit Administration's Office of Inspector General, for review of potential violations under 18 U.S.C. §§ 666, 1001, and 1961 et seq., as well as 49 U.S.C. § 5331.

11. Plaintiff further request that the Court recommend that the Department of Justice—under the distinguished leadership of U.S. Attorney General Pam Bondi who has faced death threats for fighting injustice—exercise its supervisory jurisdiction to investigate the misuse of federal transit and infrastructure funds, and to impose administrative and criminal remedies where appropriate. This referral ensures alignment between this Court's equitable authority and the Department's parallel duty to protect federal funds from waste, fraud, and abuse. It also formally places the Defendants' conduct within the federal oversight framework triggered by the PwC audit, establishing transparency and public accountability under federal law. Such injunctive relief shall extend to all City of Memphis divisions and quasi-public entities receiving federal funds—including the Memphis Area Transit Authority—until the Federal Transit Administration and the Department of Justice certify compliance with all federal procurement and grant-management regulations.

12. As a direct and proximate result of this deprivation of honest services, Plaintiff and all Memphis ratepayers and/ or taxpayers suffered measurable harm,

including increased tax burdens, inflated utility rates, and the denial of fair
representation in government decision-making. Plaintiff seeks: (a) compensatory
and treble damages under 18 U.S.C. § 1964(c); (b) declaratory judgment that the
Tennessee Prosperity PAC's donations constituted unlawful influence and conflict
of interest; and (c) injunctive relief barring the disbursement of future grants or
ordinances involving any official who accepted PAC funds during the relevant
period.

13. (Declaratory judgment that the "More for Memphis" ordinance was fraudulently
certified and is null and void ab initio; (b) Injunctive relief prohibiting further
disbursement or administration of any funds authorized under the ordinance; (c)
Compensatory, treble, and punitive damages under 42 U.S.C. § 1983 and 18
U.S.C. § 1964(c); and (d) Referral to the Tennessee Attorney General and the
U.S. Department of Justice for investigation of potential criminal violations under
T.C.A. §§ 39-16-402 and 403.

14. Attorney-Equivalent Compensation, Costs, and Interest – Award costs of suit,
litigation expenses, post-judgment interest, and reasonable attorney-equivalent
compensation to the pro se Plaintiff, consistent with the principles of equity and
42 U.S.C. § 1988(b), for time, research, and professional preparation expended
in pursuit of justice.

15. Further Relief – Grant such other and further relief as this Honorable Court
deems just, equitable, and necessary to restore public confidence and ensure

accountability in Memphis Light  Gas & Water Division and the City of Memphis

Respectfully submitted

*Rev. Dr. Gerald Kiner, Pro Se Plaintiff*

Rev  Dr. Gerald Kiner, Pro Se Plaintiff

4400 Hickory Hill Road

Memphis  Tennessee 38141

Phone  (901) 650-7340

Email  geraldkiner@gmail.com

Dated  October 28  2025

Filed In  United States District Court for the Western District of Tennessee  Western

Division

**MASTER EXHIBIT CHART**